**JEFFREY v. HENDERSON BROS.,**
Inc., et al.

No. 6309.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 12, 1951.

Decided Dec. 29, 1951.

Gordon T. Kinder, Martins Ferry, Ohio (Gordon D. Kinder, Martins Ferry, Ohio, on brief), for appellant.

Charles P. Mead and Melvin W. Kahle, Wheeling, W. Va. (W. F. Keefer, Charles L. Ihlenfeld and Riley & Riley, all of Wheeling, W. Va., on brief), for appellees.

Before PARKER, Chief Judge, and SOPER, Circuit Judge, and CHESNUT, District Judge.

SOPER, Circuit Judge.

The controversy in this case relates to the priority of certain claims against a vessel known as Tipple Boat No. 2 belonging to Rivercoal, Inc., a West Virginia Corporation. On the one hand it is claimed by Walter Jeffrey, the appellant, that a mortgage on the vessel given to him by the corporation on June 26, 1947 to secure the payment of a demand promissory note in the sum of $21,230., and recorded at the Office of the Collector of Customs at Pittsburgh, Pennsylvania, gives him a prior claim on the vessel; and on the other hand it is contended that the mortgage claim is subordinate to certain maritime liens which consist in part of wage claims in the sum of $2786.21 for services rendered by 34 persons employed on the vessel between the middle of December, 1947 and April 7, 1948, shortly before the vessel was libeled by material men and in part of claims of material men for supplies in the sum of $3497.44[1] furnished to the ship in the same period.

The mortgage was executed under the Ship Mortgage Act, 46 U.S.C.A. § 921, but the mortgagee concedes that the mortgage is not preferred since the statutory provisions contained in 46 U.S.C.A. § 922 were not met, and that therefore the mortgage claim is subordinate to valid maritime claims. But the mortgagee contends that the opposing claims do not constitute maritime liens because the wage claimants were not members of the crew of the vessel or stevedores, and because the supplies were not furnished to the vessel but to Rivercoal, Inc., the owner. The District Court held that both the wage claims and the supply claims constitute valid maritime liens upon the vessel.

The Rivercoal, Inc., had offices in the National Bank Building in Wheeling, W. Va. For some years prior to December, 1947 it was engaged in dredging coal from the bed of the Ohio River under a lease from the Public Land Corporation of West Virginia, a state authority. For this purpose the corporation used a dredge boat called the King Cole and several barges to receive the dredged material and transport it to the Tipple Boat No. 2 where it was cleaned and transferred to barges for shipment and sale.

The Tipple Boat No. 2 was a steel barge 132' in length, 34.8' in width and 9.5' in depth, which had been furnished with machinery and equipment for cleaning and screening coal. The boat was equipped with a crane for lifting the coal from barges for the cleaning operation, and loading the coal on the barges after it had been cleaned. Although the cleaning equipment was operated entirely on the vessel it could be operated on land. The vessel was enrolled and licensed at the Custom House at Pittsburgh for operation in the coastwise trade. It was without motive power but during the operations on the Ohio River it was constantly towed from place to place and every morning it was moved from its mooring at the river bank to the place of dredging

---

1. Included in the sum total of these claims is the claim of the Smith Supply Company for $365.70. It is now conceded that this claim should be reduced to the sum of $274.92.

in the stream, and every night it was moved back to the shore. During this period the vessel was equipped with a whistle and with lights, and the rules of navigation were observed with reference to the movement of river traffic.

In December, 1947 the dredging of coal ceased, and the Tipple Boat was moved from the neighborhood of Moundsville, West Virginia, on the Ohio River, to the neighborhood of Morgantown, West Virginia, on the Monongahela River. The purpose was to wash or clean the coal from two refuse gob piles which came from coal mines in the vicinity and had been placed along the river bank after it had been handpicked. The vessel was moored close to the shore and kept in place with mooring lines and spuds, and was moved along the shore down the stream by loosening the lines as the work required. One of the gob piles, 1800 to 2000 feet in length, was finished before the vessel was seized. A contractor was employed to push the piles near to the shore with a bulldozer so that the material could be reached and lifted on board by the boat's machinery. The cleaning operation and transfer to the barges were done in the same manner as in the Ohio River. At the beginning steam power for the operation of the machinery was generated on the vessel, but later power was furnished from an electric power company over a cable which ran from a pole on the shore to a pole on the ship.

There were no living quarters on the vessel and the workers spent their nights on shore. Access to the boat was provided by a gangplank and sometimes at high water by row boat. The men were members of the United Mine Workers but as far as possible river men were selected who were taught to perform the coal cleaning operation. None of them worked on the shore. The vessel and the cleaning operations were in charge of a superintendent who had had fifteen years' experience in handling machinery on river boats and was familiar with rules of navigation. He was in charge of the operations on the Ohio River and continued in charge on the Monongahela. By far the greater part of the work of the men was done in cleaning the coal, and maritime activity was reduced to a minimum, but it was still necessary at Morgantown to move the boat along the shore from time to time, to keep it securely in place by the use of lines and spuds, to direct the placing of the barges and the transfer of the coal that had been cleaned on the Tipple Boat. In addition proper lights were maintained and the whistle was used if necessary. Constant leakage from the washer during the operation caused an accumulation of water in the hull that had to be pumped out to prevent the capsizing of the boat.

The mortgagee argues from these facts that the wage claimants were neither members of the crew of the vessel nor stevedores, and therefore were not entitled to the preferred maritime lien for wages of the crew of the vessel listed with other preferred liens in the Ship Mortgage Act, 46 U.S.C.A. § 953. He does not deny that the Tipple Boat is entitled to the status of a vessel, but he contends that the boat was definitely withdrawn from navigation during the operation on the Monongahela in that it was securely fastened to the land so as to form practically a part thereof, and he says that in any event the men were not seamen but workers in a machine shop engaged in the performance of the same work as if the cleaning machinery had been set up on land. For this position he relies on such decisions as The Herdis, D.C., Md., 22 F.2d 304; Antus v. Interocean S. S. Co., 6 Cir., 108 F.2d 185; Gahagan Const. Corp. v. Armao, 1 Cir., 165 F.2d 301; South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732.

We do not think that the evidence shows that the boat was withdrawn from navigation during the operation at Morgantown. On the contrary it performed the same sort of work that it had done at Moundsville. It is true that it was not moved so frequently or so far, but it was afloat and was moved on the waters of the Monongahela as far as was necessary to accomplish the operation for which it was designed. Indeed the use of a mobile vessel to transport the cleaning machinery from place to place constituted the distinctive character of the enterprise, and the purpose was served in this

instance by providing access to the long line of material piled on the river bank.

■ Nor can it be said that the non-maritime character of much of the work performed by the wage claimants deprived them of the privileges to which members of a ship's company have been entitled from time immemorial. The lien for wages to which all persons are entitled who are employed on a vessel to assist in the main purpose for which it is engaged has been long established. It was described by Judge Brawley, speaking for this court in Saylor v. Taylor, 4 Cir., 77 F. 476, 478, as follows: " * * * It is now well settled that all persons employed on a vessel to assist in the main purpose in which she is engaged are entitled to a lien for wages. So it has been held that clerks, carpenters, chambermaids, cooks, stewards, and waiters are so entitled. Dest.Shipp. & Adm. § 173, and cases there cited. The statute above referred to, which declares that persons employed 'in any capacity' upon vessels shall be deemed 'seamen,' seems conclusive upon this point. If it be considered necessary to give a reason for a rule supported by a great weight of authority, it would be found in this, that a vessel and her crew are considered a unit. Each person aboard of her contributes according to his capacity to the success of the enterprise in which she is engaged. If she comes within the maritime jurisdiction, the persons employed aboard of her come also, with all the rights and disabilities which flow therefrom. Among those rights, from the days of Oleron, are that the ship stands responsible for the wages of the seamen. It is this assurance that enables her to command those services that are essential to the prosecution of her enterprises. Seamen, as a rule, are of a class that would with difficulty find the owners of the ship, or persons responsible for their wages, and without such assurance that the law gives for the payment of their earnings their labor would not be obtainable, and maritime undertaking would languish. If the law undertook to weigh with nice discrimination the exact amount and character of service which each person employed aboard a vessel should render in order to entitle him to this lien, it would become a snare rather than a protection."

In Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 430, it was held that a barge without motive power, that never went to sea or moved more than 30 miles from Philadelphia, was a "vessel" and that the bargeman who had charge of the vessel but had little experience as a seaman was a member "of the crew" within the meaning of the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq. The court said: 321 U.S. at pages 571–572, 64 S.Ct. at page 751 " * * * A crew is generally 'equivalent to ship's company' as Mr. Justice Story said in United States v. Winn, 28 Fed.Cas. pages 733, 737, No. 16,-740. But we pointed out in the Bassett case [409 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732], that the word does not have 'an absolutely unvarying legal significance'. 309 U.S. at page 258, 60 S.Ct. at page 548. We know of no reason why a person in sole charge of a vessel on a voyage is not as much a 'member of the crew' as he would be if there were two or more aboard. We said in the Bassett case that the term 'crew' embraced those 'who are naturally and primarily on board' the vessel 'to aid in her navigation'. Id. at page 260, 60 S.Ct. page 549. But navigation is not limited to 'putting over the helm'. It also embraces duties essential for other purposes of the vessel. Certainly members of the crew are not confined to those who can 'hand, reef and steer'. Judge Hough pointed out in The Buena Venture, D.C., 243 F. 797, 799, that 'every one is entitled to the privilege of a seaman who, like seamen, at all times contributes to the labor about the operation and welfare of the ship when she is upon a voyage.' "

See also Sheppard v. Taylor, 5 Pet., 675, 709, 8 L.Ed. 269. Butler v. Ellis, 4 Cir., 45 F.2d. 951; George Leary Const. Co. v. Madsen, 4 Cir., 272 F. 461; The Sea Lark, D.C.Wash., 14 F.2d 201; United States v. Atlantic Transport Co., 2 Cir., 188 F.2d 42; McRae v. Bowers Dredging Co., D.C. Wash., 86 F. 344, 378; The J. S. Warden, D.C.N.Y., 175 F. 314; The Minna, D.C. E.D.Mich., 11 F. 759.

■ There can be no doubt of the intention of Congress, in passing statutes for the protection and relief of seamen, to include within that class all persons employed to serve in any capacity on board a vessel. It is expressly provided in 46 U.S.C.A. § 713 that in the construction of a number of statutes therein listed, including the statute covering a libel for wages, 46 U.S.C.A. § 604, every person having command of any vessel belonging to any citizen of the United States shall be deemed the "master" thereof; and every person who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a "seaman"; and in numerous decisions the statutes have been so applied. See the cases cited in 46 U.S.C.A. prec. § 591.

The right of the supply claimants to maritime liens on the boat was resisted by the mortgagee in the District Court on much the same ground as that urged against the wage claimants. In his opinion the District Judge made the following statement:

"The necessary elements instant to the allowance of a maritime lien in favor of employees of Tipple Boat No. 2, (and the supply men) against Tipple Boat No. 2 are (a) that Tipple Boat No. 2 was a vessel as the word is used in the Ship Mortgage Act; (b) that the supplies were furnished upon the order of the owner or person authorized by the owner; and (c) that the vessel was being operated in furtherance of commerce or navigation at the time the supplies were furnished.

"Counsel for Walter Jeffrey virtually conceded requirements (a) and (b) but contend that at the time in question the boat was not being operated in furtherance of commerce or navigation. It is their contention that it was temporarily withdrawn from commerce, and they likened it to a Great Lakes ore boat during the winter when the lakes are frozen."

■ The foregoing discussion in regard to the wage claimants disposes of the like objection thus raised to the supply claims. On this appeal the mortgagee seeks to broaden his grounds of opposition to the supply claims. It is now said that the goods were sold on the credit of the owner, and not on the credit of the vessel; that there was no understanding between sellers and the buyer that the goods were to be used on Tipple Boat No. 2; that the supplies might have been purchased by the owner so far as the sellers knew for other vessels in the owner's fleet; that the supplies were delivered to the agents of Rivercoal, Inc. at the sellers' places of business or to Rivercoal, Inc. in care of the Glendale Airport, or of the Rosedale Coal Company or of Ed's Esso Station near the office of Rivercoal, Inc.; and in no instance was it shown that the supplies were delivered to the vessel itself and hence it was not proved that the goods were furnished to the vessel rather than to the owner thereof.

■ We do not think that these contentions can be sustained on the evidence in this case. The merchandise furnished consisted of articles needed and used in the replacement, repair and operation of the cleaning machinery and in the operation of the vessel. The record is devoid of any indication that the claimants waived or intended to waive their right to liens therefor on the boat as permitted by the statute, 46 U.S.C.A. § 974, and hence it is immaterial, in considering their right to a lien for necessaries under the statute, 46 U.S.C.A. § 971, that the supplies were ordered by the owner and that the sellers relied upon the credit of both the owner and the ship. Piedmont, etc., Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 10, 41 S.Ct. 1, 65 L. Ed. 97; Carr v. George E. Warren Corp., 4 Cir., 2 F.2d 333. Cf. Marshall & Co. v. "President Arthur", 279 U.S. 564, 565, 49 S.Ct. 420, 73 L.Ed. 846. Nor were the liens lost because the supplies were not delivered directly to the vessel but were furnished in the first instance to the owner at the seller's place or at the owner's place of business in Wheeling, West Virginia, or at places in the general vicinity of the vessel on the Monongahela River, such as Riverdale Mines, or Glendale Airport. It is established that the statutory lien for supplies ordered by an owner for use on a vessel and actually used thereon is not lost by delivering them to the owner or to some convenient place to be thence taken to the ship. The Yankee, 3 Cir., 233 F. 919.

594

Piedmont, etc., Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 12, 41 S.Ct. 1, 65 L. Ed. 97. A supply man may in effect make the owner his agent to complete the furnishing of supplies by putting the goods on board. Bankers Trust Co. v. Hudson River Day Line, 2 Cir., 93 F.2d 457.

A situation may arise, as in Piedmont, etc., Coal Co. v. Seaboard Fisheries Co., supra, and Bankers Trust Co. v. Hudson River Day Line, supra, in which supplies are furnished to an owner of a fleet of vessels, with or without other associated enterprises, in such a fashion that delivery is made to the owner rather than to the vessels themselves, and in such instances the connection may be broken and the lien be lost. But the lien is not lost when supplies are purchased and furnished to several vessels in common ownership under a single contract, since each vessel will be liable for that portion of the merchandise furnished to and used by it. Piedmont, etc., Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 10, 41 S.Ct. 1.

Rivercoal, Inc., owned a number of vessels and some of the supply men had furnished the company with merchandise during the Ohio operations; but these operations had ceased and the Tipple Boat No. 2 was the only one of the fleet in use during the period covered by the libellants' invoices. Moreover, all of the supplies in suit were actually sent to and used by Tipple Boat No. 2 and in most instances the deliveries were made at such places as to indicate that the goods were intended for the vessel in cleaning coal on the Monongahela River. The libel and invoices filed therewith assert that the goods were intended for this operation, and in the absence of any denial or evidence to the contrary, it is a fair inference from the record as a whole that the supply men sold the goods for use on the tipple boat and that they were forwarded to and used on the vessel. Cf. The Denelfred, D.C.E.D.Mich., 59 F.2d 213.

The priority of the wage and supply claims over the claim of the mortgagee is established, and, except for the conceded reduction in the amount of the award to the Smith Steel Supply Company, the judgment of the District Court is affirmed.