**REDCLIFFE AMERICAS LIMITED, Plaintiff–Appellee,**

v.

**M/V TYSON LYKES, ex-M/V Delaware Bay, its tackle, apparel, etc. in rem; M/V TILLIE LYKES, ex-M/V Chesapeake Bay, its tackle, apparel, etc. in rem, Defendants–Appellants,**

**First American Bulk Carrier Corporation, Claimant–Appellant.**

**No. 92–2545.**

United States Court of Appeals, Fourth Circuit.

Argued May 3, 1993.

Decided June 10, 1993.

---

**48**

Gordon D. Schreck, Buist, Moore, Smythe & McGee, P.A., Charleston, SC, argued (Christopher H. Dillon, Burke & Parsons, New York City, on brief), for appellants.

Marvin DeWitt Infinger, Sinkler & Boyd, P.A., Charleston, SC, argued (S. Marshall Huey, Jr., on brief), for appellee.

Before WILKINS and LUTTIG, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

LUTTIG, Circuit Judge:

Defendants *in rem*, the container vessels M/V Tyson Lykes and M/V Tillie Lykes, and their claimant, First American Bulk Carrier Corporation, appeal from an order of the district court granting partial summary judgment to appellee Redcliffe Americas and sustaining Redcliffe's claims for maritime liens against the vessels. We hold that because Redcliffe provided containers to the vessels' charterer rather than to the vessels themselves, maritime liens did not arise in favor of appellee. We therefore reverse.

### I.

This case arises out of two contracts entered into by Topgallant Group, Inc., an intermodal carrier that transported containerized goods by truck, rail and ship between depots in the United States and in Europe.[1] On April 21, 1987, Topgallant Group chartered the container vessels M/V Delaware Bay (since renamed M/V Tyson Lykes) and M/V Chesapeake Bay (since renamed M/V Tillie Lykes) (hereinafter collectively referred to as the "Vessels") from their owner, appellant First American Bulk Carrier Corporation (FABC). A year later, Topgallant Group leased in bulk, pursuant to a three-year equipment rental agreement (the "Agreement"), 245 refrigerated containers from appellee Redcliffe for the purpose of hauling shipments of hard frozen foods from Virginia to American military bases in Europe. The Agreement provided that these containers were "for use in particular on [Topgallant Group's] vessels 'Chesapeake [Bay]' and 'Delaware [Bay]' or such other vessels as agreed between the parties in writing." J.A. at 33.

---

1. The cargoes delivered by intermodal carriers are loaded into special shipping containers that can be transferred easily from one mode of transportation to the next until they reach their final destination. The ocean leg of each voyage is completed through the use of container vessels, which are custom-made to hold such containers.

Consistent with industry practice, Redcliffe provided the containers in bulk to Topgallant Group; it did not deliver the containers directly to the vessels or earmark specific containers for use on a particular vessel. Topgallant Group in turn distributed the containers to shippers, who loaded them, and then transported the containers to various ports in the United States and Europe. From these ports, the containers were assigned for carriage to either vessel as Topgallant Group found commercially convenient. After the cargoes reached their final destination, the process repeated itself. The containers thus were apportioned and reapportioned between the two Vessels at the discretion of Topgallant Group.

In April 1989, Topgallant Group transferred its business to an affiliated concern, Topgallant Lines, Inc., and, with FABC's consent, assigned the sub-bareboat charters covering the Vessels to Topgallant Lines. The latter firm began operating the Vessels in July of that year, frequently using the containers leased from Redcliffe. On December 13, 1989, the Topgallant companies filed for bankruptcy. FABC thereafter terminated the charters and retook possession of the Vessels.

Redcliffe brought this *in rem* action against the Vessels in district court for $432,196 in unpaid container rental charges that had accrued between September 1 and December 31, 1989. Redcliffe asserted that, pursuant to the Federal Maritime Lien Act (FMLA), it was entitled to claim the unpaid charges as maritime liens against the M/V Tyson Lykes and the M/V Tillie Lykes. FABC appeared in the action as the Vessels' claimant and denied that Redcliffe was entitled to liens.

The district court ultimately granted Redcliffe's motion for partial summary judgment on the issue of liability. *Redcliffe Americas Ltd. v. M/V Tyson Lykes,* 806 F.Supp. 69 (D.S.C.1992). Rejecting the reasoning of the Ninth Circuit in *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.,* 808 F.2d 697 (9th Cir.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 96, 98 L.Ed.2d 57 (1987), and adopting

instead the contrary view expressed in *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd. (Itel II),* 781 F.Supp. 975 (S.D.N.Y.1991),[2] the district court concluded that FMLA's requirement that necessaries be provided "to a vessel" in order for a maritime lien to arise had been satisfied, even though Redcliffe provided containers to Topgallant Group, "not based on the needs of a specific vessel, but indiscriminately in bulk." 806 F.Supp. at 72–73. The court accordingly held that Redcliffe was entitled to maritime liens against the Vessels, leaving for a later date a determination of the proper amount of damages. *Id.* at 74.

FABC and the defendant Vessels thereafter brought this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(3), advancing numerous grounds for reversal, only the first of which we need address.

## II.

### A.

The maritime lien "had its origin in desire to protect the ship," *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 9, 41 S.Ct. 1, 3, 65 L.Ed. 97 (1920). The primary impetus for recognition of the lien was concern for the ship and its needs, not the needs of suppliers or even the ship's owners:

> Since [a ship] is usually absent from the home port, remote from the residence of her owners and without any large amount of money, it is essential that she should be self-reliant—that she should be able to obtain upon her own account needed repairs and supplies.... Because the ship's need was the source of the maritime lien it could arise only if the repairs or supplies were necessary; if the pledge of her credit was necessary to the obtaining of them; if they were actually obtained; and if they were furnished upon her credit.

*Id.* These general principles of the law of maritime liens were undisturbed by passage of the FMLA in 1910. In particular, as is clear from the Court's decision in *Piedmont,*

---

2. One month after the district court issued its order, the Second Circuit reversed *Itel II. Itel*

*Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd. (Itel III),* 982 F.2d 765 (2d Cir.1992).

that Act did not expand the traditionally limited availability of the maritime lien.

In *Piedmont,* a coal dealer had contracted with a fish oil company to deliver coal for use on the oil company's fleet of steamers and in its factories. The coal was sold to the oil company, placed in its bins, and distributed by the oil company as needed to its ships and factories. When the oil company went into receivership, the coal dealer libeled twelve of the steamers, seeking maritime liens under FMLA for the unpaid price of five loads of coal.

The Supreme Court affirmed the dismissal of the libels, refusing "[t]o hold that a [maritime] lien for the unpaid purchase price of supplies arises in favor of the seller merely because the purchaser, who is the owner of a vessel, subsequently appropriates the supplies to [the vessel's] use." *Id.* at 8, 41 S.Ct. at 3. Because part of the coal was supplied for non-maritime use in the factories and, more importantly, because the coal had been furnished to the respective steamers not by the coal dealer, but by the oil company "in its discretion as owner of the coal and of the business," the Court held that no liens had arisen in favor of the coal dealer. *Id.* at 7–8, 13, 41 S.Ct. at 2, 4. Even though this result contravened the express understanding of the contracting parties, the Court refused to give a broad reading to FMLA. Under the Act, as before, stated the Court, the maritime lien is a secret one, arising by operation of law. "It may operate to the prejudice of prior mortgagees or of purchasers without notice. It is therefore *stricti juris* and will not be extended by construction, analogy or inference." *Id.* at 12, 41 S.Ct. at 4; *see also Itel III,* 982 F.2d at 768 ("As a general rule, maritime liens are disfavored by the law.").

Following *Piedmont,* courts consistently have held that a supplier claiming a maritime lien against a vessel must, *inter alia,* have delivered needed supplies directly to the vessel or somehow earmarked the supplies for use on that particular vessel. *See Dampsk-*

*ibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 277, 60 S.Ct. 937, 942, 84 L.Ed. 1197 (1940) (distinguishing *Piedmont* and sustaining maritime liens on ground that "oil was supplied exclusively for the vessels in question [and] was delivered directly to the vessels and was so invoiced"); *Bankers Trust Co. v. Hudson River Day Line,* 93 F.2d 457, 458 (2d Cir.1937) ("the requirements for a maritime lien are met, 'if the supplies, though delivered in mass to the owner of the fleet under a single contract, are expressly ordered by the owner and delivered to him by the supplyman for the use of *named vessels in specified portions*'" (emphasis supplied by Second Circuit) (*quoting The American Eagle,* 30 F.2d 293, 295 (D.Del.1929))). With the aforementioned principles and these authorities in mind, we turn to the specific issue under consideration.

**B.**

FMLA provides in relevant part that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner ... has a maritime lien on the vessel." 46 U.S.C. § 31342.[3] We assume for purposes of this appeal that Topgallant Group, as the Vessels' charterer, was authorized to order the lease of Redcliffe's containers, and that the containers constituted "necessaries" for the Vessels for purposes of the statute. The sole question before us is whether Redcliffe provided the necessaries *to the Vessels* within the meaning of the Act. Two courts of appeals, in cases virtually identical to this one, have addressed this question. Both the Ninth Circuit in *Foss Launch* and the Second Circuit in *Itel III* came to the same conclusion, with which we agree, that FMLA as construed by the Supreme Court in *Piedmont* simply "does not support a claim of maritime lien by a supplier who furnishes goods in bulk to a fleet owner or charterer, with apportionment among the ships being made at the discretion of the recipient." *Itel III,* 982 F.2d at 767.[4]

**3.** 46 U.S.C. § 31342 superseded 46 U.S.C. § 971 in 1989 without significant change. Section 971 had used the verb "furnishing" rather than "providing." Most of the cases in this field arose

prior to 1989 and therefore discuss the "furnishing" requirement of FMLA.

**4.** The court below acknowledged that its decision, like several of those it relied upon, em-

In *Foss Launch* and *Itel III*, as here, an intermodal carrier leased shipping containers from container lessors. The containers were delivered in bulk to the carriers and individual units were not designated for use on any particular ship. When the carriers failed to pay charges due under the leases, the container lessors asserted *in rem* claims for maritime liens against container ships operated by the carriers.

After discussing applicable precedent, the Ninth Circuit noted the parallels between its case and *Piedmont:*

> In each case a materialman provided bulk supplies—coal in *Piedmont,* containers here—in circumstances where the final allocation of supplies, to any vessel of the group intended to be supplied, was left to the discretion of the procuring authority. Although, in both cases, it was understood that the supplies provided would predominantly be put to maritime use, in neither case was there any evident attempt to designate any individual vessel to receive any identifiable component of the supplies.

*Foss Launch,* 808 F.2d at 702. Because the intermodal carrier, and not the lessors, had unrestricted authority to designate which containers would be used aboard particular vessels in its fleet, the court reversed the district court's judgment sustaining the lien claims, and held that "cargo containers leased in bulk to a time-charterer of a group of vessels for unrestricted use on board the vessels in that group, are not furnished to any particular vessel of the group, on which they subsequently happen to be employed, within the meaning of [FMLA]." *Id.* at 703.

The Second Circuit, citing *Piedmont, Bankers Trust,* and *Foss Launch,* similarly reversed a judgment in favor of the maritime lien claims of several container lessors. *Itel*

*III,* 982 F.2d at 769. Noting that "[t]he concept of an *in rem* hypothecation will not work in the manner intended ... if there is no identifiable ship to which the lien may attach when the obligation is created," the court observed that, in the case before it, "no one knew to which ship a container would be assigned at any given time." *Id.* at 768. Agreeing with the arguments made by the defendants *in rem* and their owners, the Second Circuit held that "under [FMLA,] maritime liens cannot be claimed for supplies furnished simply to fleet owners," and that "supplies are furnished to vessels within the meaning of [FMLA] only when they are either provided directly to or are earmarked for specific vessels." *Id.* at 767.

 Redcliffe attempts to distinguish *Foss Launch* and *Itel III* on the ground that the Agreement in this case provided that appellee's containers were to be used *only* aboard two vessels, both of which were named, and such other vessels that Redcliffe and Topgallant Group agreed to in writing. Appellee's Br. at 12–14. Two ships still constitute a fleet, however, and the containers were neither delivered directly to the Vessels by Redcliffe nor specifically earmarked for use on one of the Vessels or the other. Topgallant Group (and later Topgallant Lines), the Vessels' charterer, had the discretion to allocate and reallocate the leased containers between the two Vessels as, in its sole discretion, it deemed desirable. For example, it could have chosen to carry Redcliffe's containers only aboard one of the Vessels or, for that matter, not to use the containers on either of the Vessels. It is precisely because the charterers retained such discretion that the Second and Ninth Circuits rejected the lien claims in *Foss Launch* and *Itel III.*[5]

---

braced a broader interpretation of FMLA's requirements than had generally obtained in the caselaw, but believed that this departure "was appropriate to accommodate and favor the 'modern' practices of the container leasing industry." 806 F.Supp. at 73; *see also Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 603 (5th Cir.) (*en banc*) (espousing broad reading of FMLA furnishing requirement), *cert. denied,* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986); *Triton Container Int'l Ltd. v. M/S Itapage,* 774 F.Supp. 1349, 1350 (M.D.Fla.1990). We simply have no authority to abandon the strict precepts in *Pied-*

*mont* on the basis of a change in industry custom. Congress alone is empowered to effect such a change. *See Foss Launch,* 808 F.2d at 703 ("[W]e are not persuaded that 'modern business conditions' in the shipping industry are sufficient justification to expand the 'furnishing to any vessel' requirement of [FMLA].").

5. Redcliffe's reliance on *Carr v. George E. Warren Corp.,* 2 F.2d 333 (4th Cir.1924), and *Jeffrey v. Henderson Bros.,* 193 F.2d 589 (4th Cir.1951), in support of a contrary conclusion is misplaced.

Accordingly, because Redcliffe did not provide containers to the M/V Tyson Lykes and the M/V Tillie Lykes, we hold that maritime liens for the amounts due under the Agreement did not arise in Redcliffe's favor under the FMLA.

## III.

For the reasons stated herein, the judgment below is reversed. On remand, the district court shall dismiss Redcliffe's complaint and release the security posted by FABC.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

In both cases, there was no question that the supplies had been specifically provided to the vessels against which the maritime liens were enforced. In *Carr*, a coal dealer had sold 835 tons of coal to a fish oil and guano company, fifteen per cent of which was to be used in the company's factory, with the remainder earmarked for use on the company's four steamers. We held that the coal allocated to and used by each steamer had been sufficiently identified to sustain the coal dealer's maritime lien claims against two of the ships because "85 per cent. of the coal was sold directly for use of the steamers

named, and so billed to the vessels, and received and used by them," because this eighty-five per cent portion was used and "billed in equal parts to the four steamers," and because "the coal was placed on the piers at which the steamers coaled, and was all taken and used by them." 2 F.2d at 334. We upheld the maritime lien in *Jeffrey* because the supplies were provided to the only vessel operated by the owner, and "in most instances the deliveries were made at such places as to indicate that the goods were intended for the vessel." 193 F.2d at 594.