Filed:  August 10, 2009

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 07-1908
(1:06-cv-03346-JFM)

TRITON MARINE FUELS LTD., S.A.,

> Plaintiff - Appellant,

and

BRIDGE OIL, LTD.,

> Plaintiff,

and

CRESCENT TOWING AND SALVAGE COMPANY, INC.; COOPER/T. SMITH
MOORING; CANTON PORT SERVICES LLC; ISS MARINE SERVICES, INC.,
d/b/a Inchcape Shipping Services; BUNKER HOLDINGS, LTD.,

> Intervenors/Plaintiffs,

> v.

M/V PACIFIC CHUKOTKA, apparel, freights, etc., IMO No.
8800224,

> Defendant – Appellee,

and

EMERALD REEFER LINES, LTD.; GREEN PACIFIC A/S; EMERALD REEFER
LINES, LLC; INTERTRANSPORT CO., LLC; INTERTRANSPORT, LTD.,

> Defendants,

and

THE MASTER OF THE M/V PACIFIC CHUKOTKA,

> Garnishee.

## O R D E R

The court amends its opinion filed July 29, 2009, as follows:

On page 2, attorney information section, the word "ARGUED:" is added at the beginning of line 1; on page 3, attorney information section, the words "ON BRIEF:" are added on line 2; and the name of "Manuel R. Llorca, LLORCA & HAHN LLP, Norwalk, Connecticut, for Appellant." is added on lines 2 and 3.

For the Court - By Direction

/s/ Patricia S. Connor

Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TRITON MARINE FUELS LTD., S.A.,

    *Plaintiff-Appellant,*

  and

BRIDGE OIL, LTD.,

      *Plaintiff,*

  and

CRESCENT TOWING AND SALVAGE
COMPANY, INC.; COOPER/T. SMITH
MOORING; CANTON PORT SERVICES
LLC; ISS MARINE SERVICES, INC.,
d/b/a Inchcape Shipping Services;
BUNKER HOLDINGS, LTD.,

    *Intervenors/Plaintiffs,*

    v.

M/V PACIFIC CHUKOTKA, apparel,
freights, etc., IMO No. 8800224,

    *Defendant-Appellee,*

  and

No. 07-1908

EMERALD REEFER LINES, LTD.;
GREEN PACIFIC A/S; EMERALD
REEFER LINES, LLC; INTERTRANSPORT
CO., LLC; INTERTRANSPORT, LTD.,

*Defendants,*

and

THE MASTER OF THE M/V PACIFIC
CHUKOTKA,

*Garnishee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:06-cv-03346-JFM)

Argued: May 12, 2009

Decided: July 29, 2009

Before SHEDD, Circuit Judge, Joseph F. ANDERSON, Jr.,
United States District Judge for the District of
South Carolina, sitting by designation, and
Martin K. REIDINGER, United States District Judge for the
Western District of North Carolina, sitting by designation.

---

Reversed and remanded with instructions by published opinion.
Judge Reidinger wrote the opinion, in which Judge Shedd and
Judge Anderson joined.

---

## COUNSEL

**ARGUED:** Geoffrey S. Tobias, OBER, KALER, GRIMES & SHRIVER,
PC, Baltimore, Maryland, for Appellant. David W. Skeen, WRIGHT,

CONSTABLE & SKEEN, LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Manuel R. Llorca, LLORCA & HAHN LLP, Norwalk, Connecticut, for Appellant.

## OPINION

REIDINGER, District Judge:

In this maritime action, Triton Marine Fuels Ltd., S.A. ("Triton"), a Panamanian corporation, alleges that it supplied the M/V PACIFIC CHUKOTKA ("PACIFIC CHUKOTKA" or "Vessel") with fuel bunkers in a foreign port but was never paid. Triton brought an *in rem* claim against the Vessel in federal district court, asserting a maritime lien under the Federal Maritime Lien Act, 46 U.S.C.A. § 31342(a) (West 2007) ("FMLA"). Upon a motion for summary judgment filed by the PACIFIC CHUKOTKA's owner, Green Pacific A/S ("Green Pacific"), the district court dismissed Triton's *in rem* action against the Vessel. Triton now appeals, arguing that the district court erred in concluding that a maritime lien did not arise in favor of Triton under the FMLA. For the reasons that follow, we reverse the district court's grant of summary judgment in favor of Green Pacific and remand with instructions to enter summary judgment in favor of Triton.

I.

The material facts are not in dispute. On December 30, 2005, Green Pacific, a Norwegian company, bareboat chartered[1] the PACIFIC CHUKOTKA to Intertransport Company LLC ("Intertransport"), a Russian company. The bareboat charter provided that Intertransport was to operate and manage the Vessel in all respects for its own account and to purchase fuel

---

[1]Under a bareboat charter, also known as a demise charter, "the shipowner surrenders possession and control of the vessel to the charterer, who then succeeds to many of the shipowner's rights and obligations." *Black's Law Dictionary* 250 (8th ed. 2004).

for its own account and at its own expense. The charter further prohibited Intertransport and its agents from incurring any maritime liens on the Vessel and specifically required the posting of a notice on the Vessel to the effect that the charterer had no authority to create, incur or permit any such lien. There is no evidence, however, that any such notice was ever posted.

In June 2006, Green Pacific delivered the Vessel to Intertransport, which then sub-chartered the Vessel to Emerald Reefer Lines, Ltd. ("ERL"), a Cayman Islands corporation with its principal place of business in Seattle, Washington. At the time of the subject transaction, the PACIFIC CHUKOTKA was registered provisionally under the laws of Malta but thereafter sailed under a Russian flag.

The PACIFIC CHUKOTKA was among a number of vessels owned by Green Pacific which delivered cargos of seafood to various destinations, including the United States. In its capacity as a sub-charterer, ERL operated the vessels and had the option to purchase them at a later time.

On August 2, 2006, an employee of Ocean Transportation Services LLC, ERL's agent in Seattle, sought a supply of fuel bunkers for the PACIFIC CHUKOTKA to be delivered in Odessa, Ukraine. The request was sent to Triton Marine Fuels Canada Inc. ("Triton Canada") a Canadian corporation in Quebec, Canada, which serves as an agent for Triton. Triton Canada responded that same day, confirming ERL's request for delivery of fuel bunkers by Triton to the Vessel in Odessa between August 3 and August 8, 2006 ("Bunker Confirmation"). The Bunker Confirmation identifies ERL as the buyer acting "[o]n behalf of the M/V 'Pacific Chukotka' and jointly and severally her Master, Owners, Managing Owners/Operators, Managers, Disponent Owners, Charterers, and Agents." (J.A. 030). The Bunker Confirmation also contains a choice-of-law provision, which states: "This agreement shall be governed and construed in all particulars by the laws of the

United States of America, and the parties hereby agree to the jurisdiction of the United States District Courts." (J.A. 032).

On August 5, 2006, the bunkers were delivered to the PACIFIC CHUKOTKA in Odessa. That same day, Triton submitted an invoice to ERL in Seattle requesting payment of $260,400.00 by November 2, 2006, by telegraphic transfer through a New York bank to Triton's account in London. ERL never paid for the bunkers and is now insolvent.

On December 15, 2006, Triton filed this *in rem* action against the PACIFIC CHUKOTKA in the United States District Court for the District of Maryland, seeking to enforce a maritime lien under United States law. Thereafter, the Vessel was arrested while discharging cargo in the port of Baltimore. In January 2007, Green Pacific posted security to obtain the Vessel's release.

Green Pacific moved for summary judgment on Triton's *in rem* claim. Triton, in turn, filed a cross-motion for summary judgment. The district court, assuming the application of United States law, concluded that no maritime lien arose as a result of the bunkers transaction because "the FMLA is not to be applied extraterritorially to confer a maritime lien upon the plaintiff." (J.A. 089). Accordingly, the district court granted Green Pacific's motion for summary judgment, denied Triton's motion, and dismissed Triton's *in rem* action against the Vessel. This appeal followed.

## II.

We review the district court's grant of summary judgment *de novo*, applying the same standards as those applied by the district court. *Catawba Indian Tribe of S.C. v. City of Rock Hill*, 501 F.3d 368, 370-71 (4th Cir. 2007). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no gen-

uine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III.

This appeal requires the Court to address two principal issues. First, the Court must determine whether the choice-of-law provision in the Bunker Confirmation is enforceable as it applies to Triton's *in rem* action against the Vessel. Second, if the choice-of-law provision is enforceable, and United States law therefore applies, the Court must determine whether Triton is entitled to a maritime lien under United States law.

For the following reasons, we conclude that the choice-of-law provision in the Bunker Confirmation should be enforced with respect to Triton's *in rem* claim against the Vessel. We further conclude that Triton is entitled to a maritime lien as a matter of law.

## A.

In determining the enforceability of the choice-of-law provision in the contract, we look to principles of federal maritime law. *See generally M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972); *Richards v. Lloyd's of London*, 135 F.3d 1289, 1292-93 (9th Cir. 1998) (en banc); *but see Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1124 (9th Cir.) (applying traditional choice-of-law principles to determine which country's law determines the validity of choice-of-law provision in contract), *cert. denied*, 129 S. Ct. 628 (2008). "In the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 571 . . . (1953), and its progeny." *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997)). Where the parties have specified in their contract which law should apply to their

transaction, however, "admiralty courts will generally give effect to that choice." *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 233 (4th Cir. 2003) (quoting *Chan*, 123 F.3d at 1297). It is well established under federal maritime law that absent a compelling reason of public policy, a freely negotiated choice-of-law clause in a maritime contract should be enforced. *See Bremen*, 407 U.S. at 12-13 ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect."); *Lauritzen*, 345 U.S. at 588-89 (1953) ("Except as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply."); *Bominflot, Inc. v. M/V HENRICH S*, 465 F.3d 144, 148 (4th Cir. 2006) ("Because no 'other law' is specified on the face of the contract, and public policy does not counsel against it, we will respect the parties' intentions and apply English law.").

The parties do not appear to dispute that United States maritime law governs whether the choice-of-law provision is enforceable. Green Pacific, however, argues three reasons as to why the choice-of-law provision is unenforceable in this case: first, that Green Pacific was not a party to the contract and thus did not assent to such choice of law; second, that it would be fundamentally unfair to adversely affect Green Pacific's rights in its property (the Vessel) based upon a choice-of-law provision to which it did not agree; and third, that the choice-of-law provision selecting United States law is an indirect attempt to do what cannot be done directly, to wit: create a maritime lien by contract.

1.

Green Pacific first argues that the choice-of-law provision in the Bunker Confirmation cannot bind Green Pacific or its property without its knowledge or consent. Green Pacific's argument, however, ignores the fact that this case involves an

*in rem* action asserting a maritime lien against the Vessel, rather than an *in personam* claim against Green Pacific as the Vessel's owner. As such, the relevant inquiry is not whether the parties to the supply contract had authority to bind the Vessel owner, but whether the parties had the authority to bind the *Vessel*. In the case of a maritime lien, the vessel itself is viewed as the obligor, regardless of whether the vessel's owner is also obligated. *See Amstar Corp. v. S/S ALEXAN-DROS T.*, 664 F.2d 904, 908-09 (4th Cir. 1981); *see also Black's Law Dictionary* 943 (8th ed. 2004) ("[The maritime lien] arises by operation of law and exists as a *claim upon the property*, secret and invisible.") (quoting Griffith Price, *The Law of Maritime Liens* 1 (1940)) (emphasis added).

As the sub-charterer of the Vessel, ERL had the presumptive authority to bind the Vessel in this case. It is a fundamental tenet of maritime law that "[c]harterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries[2]." *Trans-Tec*, 518 F.3d at 1127-28. If it were not so, charterers could not stray far from a ship's owner for fear of being stranded by their inability to secure fuel, repairs or other necessaries. ERL's presumptive authority was not diminished by the existence of a "no lien" clause in Green Pacific's charter, as there is nothing in the record to suggest that Triton had actual knowledge of that provision. *See id.* at 1129. Accordingly, we conclude that ERL had the authority to bind the Vessel to the provisions of the Bunker Confirmation, even without Green Pacific's knowledge or consent.

2.

In arguing that enforcement of the choice-of-law clause would adversely affect its property rights, Green Pacific cites

---

[2]"Necessaries" is defined as including "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C.A. § 31301(4) (West 2007). Fuel bunkers are considered necessaries within the meaning of the FMLA. *See Bominflot*, 465 F.3d at 147.

to cases wherein courts have refused to enforce a maritime choice-of-law provision on the grounds that the law chosen by the parties would operate to affect adversely the rights of an entity which was not a party to the agreement. *See, e.g.*, *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024 (2d Cir. 1973); *Redcliffe Americas Ltd. v. M/V Tyson Lykes*, 806 F. Supp. 69, 71 (D.S.C. 1992) (citing *Rainbow Line*), *reversed on other grounds*, 996 F.2d 47 (4th Cir. 1993).

There is a split of authority among the circuits as to this issue, with the Second Circuit's position in *Rainbow Line* being at variance with the position of the Fifth Circuit as expressed in *Liverpool & London S.S. Protection & Indemnity Association v. QUEEN OF LEMAN MV*, 296 F.3d 350 (5th Cir. 2002), and the Ninth Circuit as recently expressed in *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120 (9th Cir.), *cert. denied*, 129 S. Ct. 628 (2008). The facts of *Trans-Tec* are strikingly similar to the instant case. In *Trans-Tec*, a foreign supplier entered into a contract with a charterer of a foreign-flagged vessel for the provision of fuel bunkers in a South Korean port. *Id.* at 1122. The contract called for the application of United States law to the transaction. After the charterer failed to pay for the fuel, the supplier brought an *in rem* action in district court against the vessel, seeking to assert a maritime lien under United States law. *Id.* at 1123. The supplier also asserted an *in personam* claim for breach of contract against the vessel owner. The district court concluded that the choice-of-law provision was incorporated as a term of the contract, but that United States law did not provide for maritime liens to foreign suppliers servicing foreign-flagged ships in foreign ports. *Id.* On appeal, the vessel owner urged the Court not to enforce the choice-of-law provision, arguing that the transaction was "too foreign" for United States law to apply. *Id.* at 1126. The Ninth Circuit rejected the owner's argument, noting that this approach would "ignore[ ] both the long-recognized principle of honoring the expectations of the parties to a contract and the scope of a maritime lien under the FMLA." *Id.*

In so holding, the Court relied upon the Fifth Circuit's decision in *QUEEN OF LEMAN*. In that case, the Fifth Circuit upheld a maritime lien asserted by an English insurer against a vessel for unpaid insurance premiums. Although the insurance contract provided that it was to be governed by English law, the contract also provided that the insurer could "enforce its right of lien in any jurisdiction in accordance with local law in such jurisdiction." 296 F.3d at 353. The Fifth Circuit concluded that the insurer was entitled to seek a maritime lien under the FMLA by bringing suit in the Eastern District of Louisiana, declaring "there is nothing absurd about applying the law of the jurisdiction into which the ship sails, as the ship's presence in the jurisdiction represents a substantial contact." *Id.* at 354. The Ninth Circuit agreed with the Fifth Circuit's reasoning, stating as follows:

> *QUEEN OF LEMAN* thus counsels that where foreign parties have specified that they want United States law to determine the existence of a maritime lien in a transaction involving multiple foreign points of contact, and the ship has sailed into the United States, it is reasonable to uphold the choice of American law. That a maritime lien might exist on the vessel under United States law, but would not exist under Malaysian law, was a consequence obviously contemplated by the contracting parties, and because the [vessel] sailed into a United States port, results in no fundamental unfairness.

*Trans-Tec*, 518 F.3d at 1126-27.

We find the reasoning of *Trans-Tec* and *QUEEN OF LEMAN* to be more persuasive than that of *Rainbow Line*. In *Rainbow Line*, the Second Circuit refused to apply the law as chosen by the contracting parties after engaging in only a cursory analysis and without any reference to the Supreme Court's seminal decision in *Bremen*, which had been handed down only a year prior. The Ninth Circuit's opinion in *Trans-*

*Tec* and the Fifth Circuit's opinion in *QUEEN OF LEMAN*, on the other hand, are not only well-reasoned, but are consistent with the holdings of the Supreme Court in *Bremen* and *Lauritzen*, as well as of this Court, to the effect that absent compelling reasons of public policy, a choice-of-law provision in a maritime contract should be enforced. *See Bremen*, 407 U.S. at 12-13; *Lauritzen*, 345 U.S. at 588-89; *Bominflot*, 465 F.3d at 148; *Hawkspere*, 330 F.3d at 233.[3]

Applying the reasoning of *Trans-Tec* and *QUEEN OF LEMAN* to the present case, we note that the parties agreed to have their transaction governed by the laws of the United States, and the Vessel sailed into a United States port. Application of United States law under these circumstances would not result in any fundamental unfairness to Green Pacific. Indeed, Green Pacific is not subject to any more prejudice than it would have been had the sub-charterer elected to receive necessaries while in a United States port, whereby a maritime lien unquestionably would have arisen by operation of United States law.[4] Nor would enforcement of this provision create "unnecessary uncertainty" in maritime dealings, as predicted by the court below. (J.A. 089). To the contrary, as the Ninth Circuit has noted, "recognition of freely negotiated contract terms encourages predictability and certainty in the realm of international maritime transactions." *Trans-Tec*, 518 F.3d at 1131.

---

[3]Additionally, it should be noted that the adversely affected third party in *Rainbow Line* was a mortgagee to the vessel's subsequent owner and thus was "an entity far removed from the original parties to the charter." *Trans-Tec*, 518 F.3d at 1127. Conversely, the third party affected by the maritime lien in the present case is the ship owner itself, a party that has a direct contractual relationship with the charterer. For these reasons, *Rainbow Line* is also distinguishable on its facts.

[4]Additionally, it should be noted that Green Pacific could have taken any number of steps, including requiring the charterer to post a bond, demanding a letter of credit or even possibly procuring some sort of insurance, in order to protect its interest in the Vessel from the effects of a maritime lien, but no such actions were apparently taken in this case.

3.

Green Pacific next contends that the choice-of-law provision is unenforceable because under federal maritime law, a supplier and charterer cannot create a maritime lien by contract. Green Pacific argues that by contractually choosing United States law, ERL and Triton attempted to do indirectly what they could not do directly, that is, create a maritime lien.

As this Court has noted, "maritime liens are *stricti juris* and cannot be created by agreement between the parties; instead, they arise by operation of law, often depending on the nature and object of the contract." *Bominflot*, 465 F.3d at 146; *see also Redcliffe Americas Ltd. v. M/V Tyson Lykes*, 996 F.2d 47, 50 (4th Cir. 1993) (noting that a "maritime lien is a secret one, arising by operation of law"). By selecting United States law to govern their transaction, Triton and ERL quite likely contemplated the possibility of a maritime lien arising under United States law. The inclusion of this choice-of-law provision, however, did not "create[ ] by agreement" any such lien; the maritime lien would still have to arise by operation of law. Whether in fact such a lien arose in this case is a separate issue and one which will be addressed next in our analysis.

B.

Having determined that the choice-of-law provision in the Bunker Confirmation is enforceable with respect to Triton's *in rem* claim, we now address whether a maritime lien was created in favor of Triton under United States law.

"As with any question of statutory interpretation, our analysis begins with the plain language of the statute." *Jimenez v. Quarterman*, 129 S. Ct. 681, 685 (2009). When analyzing the meaning of a statute, we must first "determine whether the language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Whether the statutory language is plain and unambiguous "is deter-

mined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341. If the language is plain and "the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end of our analysis." *Zuni Public School Dist. No. 89 v. Department of Educ.*, 550 U.S. 81, 93-94 (2007). "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000)).

The FMLA provides, in pertinent part, as follows:

> (a) [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner –
>
> (1) has a maritime lien on the vessel;
>
> (2) may bring a civil action in rem to enforce the lien; and
>
> (3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C.A. § 31342(a) (West 2007).

By its plain language, the FMLA affords a maritime lien to "*a* person providing necessaries to *a* vessel." *Id.* (emphasis added). The FMLA does not limit the availability of maritime liens to *American* suppliers any more than it limits liens to *American* vessels, nor does it require that the provision of necessaries occur within an *American* port. As the Court noted in *Trans-Tec*:

> The FMLA, by its plain language, is not restricted in application to United States citizens, American companies, or companies doing business in the United States. Though Congress may have had American suppliers in mind, the statute, on its face, recognizes a maritime lien in favor of *any* person providing necessaries.

518 F.3d at 1130.

Although it is unnecessary to look beyond the plain language of the statute, we note that this interpretation of the statutory language is consistent with the original purposes of the FMLA. Prior to 1910, a maritime lien arose under United States law when necessaries were provided to a vessel in a port of a foreign country or state, but no such lien arose if the necessaries were supplied in a port of the vessel's home state, unless a lien was authorized by local state law. *See The Roanoke*, 189 U.S. 185, 193-94 (1903); *The Gen. Smith*, 17 U.S. (4 Wheat.) 438, 443 (1819). To address this anomaly, Congress enacted the FMLA. Act of June 23, 1910, ch. 373 § 1, 36 Stat. 604. As the Supreme Court later explained, the purpose of the FMLA was three-fold:

> *First*, to do away with the artificial distinction by which a maritime lien was given for supplies furnished to a vessel in a port of a foreign country or state, but denied where the supplies were furnished in the home port or state. *Second*, to do away with the doctrine that, when the owner of a vessel contracts in person for necessaries or is present in the port when they are ordered, it is presumed that the materialman did not intend to rely upon the credit of the vessel, and that hence, no lien arises. *Third*, to substitute a single federal statute for the state statutes in so far as they confer liens for repairs, supplies and other necessaries.

*Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 11 (1920) (citations omitted). Clearly, even before the enactment of the FMLA, a maritime lien attached under federal maritime law upon the provision of necessaries in a foreign port. The FMLA merely *expanded* that application to the provision of necessaries in ports of the United States. Despite numerous recodifications,[5] the fundamental purposes underlying the FMLA have remained unchanged. The FMLA provides a single federal statute for the determination of maritime liens, and by providing this uniform scheme, the statute confers domestic suppliers of necessaries with the same lien rights as previously enjoyed only by foreign suppliers under the common law.

In concluding that the FMLA protects only American, not foreign, suppliers, the district court relied on *Trinidad Foundry and Fabricating, Ltd. v. M/V K.A.S. Camilla*, 966 F.2d 613 (11th Cir. 1992); *Tramp Oil and Marine, Ltd. v. M/V "Mermaid I"*, 805 F.2d 42 (1st Cir. 1986); and *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 435 F.Supp.2d 1015 (C.D. Cal. 2005). In each of these cases, the FMLA was found to be inapplicable because the services or supplies at issue were rendered by foreign companies in foreign ports. None of the cases are binding on this Court, nor do we find any of these cases to be persuasive. These cases ignore the fact that federal maritime law extended a maritime lien for the provision of necessaries in foreign ports even before the enactment of the FMLA, and that the FMLA was intended to provide this rem-

---

[5]In 1920, the FMLA was recodified as part of the Ship Mortgage Act of 1920, previously codified at 46 U.S.C.A. §§ 971-75. The substance of the FMLA remained virtually unchanged until 1971, when Congress enacted legislation essentially to void "no lien" clauses in charters, as long as the supplier did not have actual knowledge of such clause. *See* H.R. Rep. No. 92-340 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1363, 1365-66. In 1988, the FMLA was recodified as part of the Commercial Instruments and Maritime Liens Act, 46 U.S.C. §§ 31301-31343 (West 2007). This recodification did not affect any substantive changes to the FMLA. H.R. Rep. No. 100-918 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6104, 6141.

edy for American suppliers *as well*. Furthermore, as previously noted, the *Trans-Tec* decision cited by the district court has been reversed by the Ninth Circuit Court of Appeals as to this issue, and as such, any reliance thereon is misplaced. Furthermore, a close examination of the *Trinidad* and *Tramp Oil* decisions reveals that the pronouncements by these courts that the FMLA does not apply to foreign suppliers in foreign ports were merely dicta. In *Trinidad*, the Eleventh Circuit enforced a choice-of-law clause calling for the application of English law and therefore concluded that the FMLA did not apply to the transaction. 966 F.2d at 615, 617. In *Tramp Oil*, the First Circuit held that a British fuel broker, which had no direct relation to the vessel itself, was not entitled to a "suppliers' lien" under the FMLA, as it was not a "supplier." 805 F.2d at 46. Additionally, *Tramp Oil* relies on a misreading of the FMLA's legislative history. *See id.* (citing H.R. Rep. No. 92-340 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1363, 1365) (stating that enactment of amendment would "be of great assistance to *American* materialmen in collecting amounts owed on necessaries") (emphasis added). This "passing reference" to the protection of American suppliers, however, "hardly overrides the unambiguous language of the statute." *Trans-Tec*, 518 F.3d at 1130.

In rejecting Triton's maritime lien claim, the district court expressed concern regarding the extraterritorial application of the FMLA, finding that there was a lack of material ties between the transaction and the United States. This case presents no problems of extraterritoriality, however, because there are a significant number of ties between the United States and the transaction at issue. ERL has its principal place of business in the United States and conducted its negotiations for the bunkers transaction there. Additionally, the fuel procured from Triton enabled the Vessel to travel to the United States and to deliver its cargos of seafood to a United States port. Finally, and perhaps most significantly, the parties chose United States law to govern their transaction. The parties' agreement to apply United States law to their transaction,

when considered along with the contacts between the transaction and the United States, "put[s] to rest any fears that an American court is unilaterally imposing the FMLA on other nations." *Id.* at 1132.

## IV.

For the foregoing reasons, we conclude that the choice-of-law provision in the Bunker Confirmation should be enforced and that United States law is therefore applicable to Triton's *in rem* claim against the Vessel. We further conclude that as a matter of law, a maritime lien arose in favor of Triton under the FMLA. There being no genuine issue of any material fact, and having concluded that Triton is entitled to a judgment as a matter of law, we conclude that the district court erred in granting summary judgment to Green Pacific and denying summary judgment to Triton. Accordingly, we reverse the judgment of the district court and remand with instructions to enter summary judgment in favor of Triton. *See United States v. St. Louis Univ.*, 336 F.3d 294, 304 (4th Cir. 2003) (court of appeals may direct entry of judgment in favor of the appellant where cross-motions for summary judgment have been filed).

*REVERSED AND*
*REMANDED WITH INSTRUCTIONS*