**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 14-1434**

───────────

WORLD FUEL SERVICES TRADING, DMCC, d/b/a Bunkerfuels,

        Plaintiff - Appellee,

    v.

HEBEI PRINCE SHIPPING COMPANY, LTD.,

        Claimant – Appellant,

    and

M/V HEBEI SHIJIAZHUANG, her engines, tackle, equipment, appurtenances, etc., in rem,

        Defendant,

T. PARKER HOST, INC.,

        Claimant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Mark S. Davis, District Judge. (2:13-cv-00173-MSD-DEM)

───────────

Argued: January 28, 2015        Decided: April 17, 2015

───────────

Before WILKINSON, AGEE, and HARRIS, Circuit Judges.

───────────

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Harris concurred.

───────────

**ARGUED:** Steven Michael Stancliff, CRENSHAW, WARE & MARTIN, P.L.C., Norfolk, Virginia, for Appellant.  Mark T. Coberly, VANDEVENTER BLACK, LLP, Norfolk, Virginia, for Appellee.  **ON BRIEF:** James L. Chapman, IV, CRENSHAW, WARE & MARTIN, P.L.C., Norfolk, Virginia, for Appellant.  Dustin M. Paul, VANDEVENTER BLACK, LLP, Norfolk, Virginia, for Appellee.

———————————

AGEE, Circuit Judge:

World Fuel Services Trading, DMCC, ("DMCC") brought this in rem action against the M/V HEBEI SHIJIAZHUANG ("the Vessel") seeking to enforce a maritime lien for the supply of necessaries under the Federal Maritime Lien Act ("FMLA"), 46 U.S.C. § 31342(a). The district court held that DMCC was entitled to a maritime lien for the amount due for marine fuel (referred to as "bunkers") provided to the Vessel, and granted DMCC's motion for summary judgment. Hebei Prince Shipping Company, Limited, ("Hebei Prince"), the owner of the Vessel, appeals. For the reasons that follow, we affirm the judgment of the district court in favor of DMCC.

I.

A.

To provide context for the underlying dispute, we begin with a brief review of maritime lien law. A maritime lien is "[a] lien on a vessel, given to secure the claim of a creditor who provided maritime services to the vessel[.]" Black's Law Dictionary 1065 (10th ed. 2014). "It arises by operation of law and exist[s] as a claim upon the property." Id. (quoting Griffith Price, The Law of Maritime Liens 1 (1940)); see also Triton Marine Fuels Ltd., S.A. v. M/V PAC. CHUKOTKA, 575 F.3d 409, 416 (4th Cir. 2009) ("'[M]aritime liens are stricti juris

3

and cannot be created by agreement between the parties; instead, they arise by operation of law, often depending on the nature and object of the contract.'" (quoting Bominflot, Inc. v. M/V HENRICH S, 465 F.3d 144, 146 (4th Cir. 2006)).

Congress enacted the FMLA in 1910, which altered several then-existing common law principles governing when a maritime lien would arise under United States law. See id. at 417. That initial legislation "provide[d] a single federal statute for the determination of maritime liens, and by providing this uniform scheme, the statute confer[red] domestic suppliers of necessaries with the same lien rights as previously enjoyed only by foreign suppliers under the common law." Id. at 418. The next major change to the FMLA occurred in "1971, when Congress enacted legislation essentially to void 'no lien' clauses in charters, as long as the supplier did not have actual knowledge of such clause." Id. at 418 n.5. Most recently, the FMLA was recodified as part of the Commercial Instruments and Maritime Liens Act, 46 U.S.C. §§ 31301-31343. For ease of reference, however, we will continue to refer to the relevant statutes as the "FMLA." "Despite [these] recodifications, the fundamental purposes underlying the FMLA have remained unchanged." Triton Marine, 575 F.3d at 417-18.

Generally speaking, a maritime lien arises more readily under the FMLA than under the laws of other maritime countries.

4

E.g., Bominflot, 465 F.3d at 147 ("The United States as well as a number of civil law nations . . . allow for broader use and enforcement of maritime liens[.]").  As a result, which nation's law governs a particular maritime contract may be significant in determining whether, or to what extent, a maritime lien exists.

B.

Hebei Prince, a corporation organized under the laws of China, owns the Vessel, which is registered in Hong Kong.  The Vessel was leased to a Greek corporation, Tramp Maritime Enterprises Ltd. ("Tramp Maritime") under three consecutive time charters (maritime contracts of ship charter) covering the period from May 23, 2012 to November 28, 2012.  The terms of the time charters prohibited Tramp Maritime from incurring "any lien or encumbrance" against the Vessel.  (J.A. 86.)

In October 2012, Tramp Maritime emailed Aristades P. Vogas of Bunkerfuels Hellas in Athens, Greece, to arrange for the purchase of bunkers to be delivered to the Vessel while it was docked at a port in the United Arab Emirates.  The email reply from Vogas confirming the transaction ("the Bunker Confirmation") identifies the "seller" as "BUNKERFUELS A DBA/DIVISION OF WFS Trading DMCC" and the "buyer" as "MV HEBEI SHIJIAZHUANG AND HER OWNERS/OPERATORS AND TRAMP MARITIME ENTERPRISES LTD."  (J.A. 21.)  It also identifies APSCO JEDDAH

5

as the "physical supplier" of the bunkers. (J.A. 21.) The Bunker Confirmation further states:

> ALL SALES ARE ON THE CREDIT OF THE VSL. BUYER IS PRESUMED TO HAVE AUTHORITY TO BIND THE VSL WITH A MARITIME LIEN. DISCLAIMER STAMPS PLACED BY VSL ON THE BUNKER RECEIPT WILL HAVE NO EFFECT AND DO NOT WAIVE THE SELLER'S LIEN. THIS CONFIRMATION IS GOVERNED BY AND INCORPORATES BY REFERENCE SELLER'S GENERAL TERMS AND CONDITIONS IN EFFECT AS OF THE DATE THAT THIS CONFIRMATION IS ISSUED. THESE INCORPORATED AND REFERENCED TERMS CAN BE FOUND AT WWW.WFSCORP.COM. ALTERNATIVELY, YOU MAY INFORM US IF YOU REQUIRE A COPY AND SAME WILL BE PROVIDED TO YOU.

(J.A. 21.)

APSCO JEDDAH delivered the bunkers to the Vessel according to the terms of the Bunker Confirmation. The Vessel's chief engineer signed the delivery notices and attached a "no lien" stamp, which stated "Bunkering Services and the bunkers are ordered solely for the account of Charterers and not for owners. Accordingly no lien or other claims whatsoever against the Vessel or her owners can arise." (J.A. 19, 20.)

Tramp Maritime subsequently received an invoice for the bunkers purporting to be from "BUNKERFUELS A Division of World Fuel Services Trading, DMCC" requesting payment. (J.A. 22.) The invoice stated that the amount due could be wire-transferred to a Bank of America account for "World Fuel Services Europe, Ltd." (J.A. 22.) Neither Tramp Maritime nor any other party paid the invoice.

6

DMCC then filed this in rem action in the United States District Court for the Eastern District of Virginia asserting it was owed $809,420.50 for the unpaid bunkers,[1] and that it was entitled to enforce a maritime lien on the Vessel under the FMLA. It also moved for the court to issue a maritime warrant for the arrest of the Vessel, which was expected to port in Norfolk, Virginia, within fourteen days. The district court issued an order for the maritime arrest warrant, which was executed on the Vessel when it docked in Norfolk. Hebei Prince later posted a cash bond so that the Vessel could be released before resolution of the underlying complaint.

DMCC moved for summary judgment, which Hebei Prince opposed. Hebei Prince then filed a cross-motion for summary judgment, relying on the same grounds raised in its opposition to DMCC's motion. Challenging nearly every aspect of DMCC's claim, Hebei Prince argued: (1) DMCC was not a party in privity to the Bunker Confirmation and thus could not assert a maritime lien; (2) Greek law should apply to every aspect of the contractual dispute; (3) the Bunker Confirmation did not successfully incorporate the General Terms & Conditions on which DMCC relied; (4) the General Terms & Conditions could not apply to DMCC even if DMCC sought to incorporate them; (5) the General

---

[1] This amount reflected the amount due for the bunkers plus a contract-based administrative fee for past-due sums.

7

Terms & Conditions' choice-of-law provision did not "choose" United States statutory maritime law such as the FMLA; (6) DMCC had actual knowledge of the prohibition of liens in Tramp Maritime's time charter and thus could not rely on the FMLA's presumption to bind the Vessel; and (7) principles of comity require rejecting the application of United States law to this transaction.

In a thorough opinion, the district court rejected all but one of Hebei Prince's arguments, and, in any event, that one area of agreement did not alter the court's ultimate holding. See World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG, 12 F. Supp. 3d 792 (E.D. Va. 2014). In sum, the district court concluded that the Bunker Confirmation successfully incorporated the General Terms & Conditions DMCC relied upon to establish that United States law, including the FMLA, governed the existence and enforcement of a maritime lien. The district court also held that "no genuine issue of material fact regarding the existence of a maritime lien in this matter [exists and that], as a matter of law, [DMCC was] entitled to a maritime lien against the [V]essel." Id. at 810.

Following briefing and a hearing on the amount of damages to be awarded, the district court entered final judgment awarding DMCC $813,740.10. Hebei Prince noted a timely appeal.

8

Jurisdiction exists for the reasons discussed below in Section II.A.

## II.

Hebei Prince raises the same arguments on appeal that it did in the district court. As for relief, it alternatively argues that we should dismiss the case for lack of admiralty jurisdiction, vacate the district court's award of summary judgment to DMCC and remand to resolve disputed issues of material fact, or vacate the district court's judgment and enter final judgment in its favor.

We review the district court's grant of summary judgment de novo, applying the same standard as the district court. FDIC v. Cashion, 720 F.3d 169, 173 (4th Cir. 2013). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition to construing the evidence in the light most favorable to Hebei Prince, the non-movant, we also draw all reasonable inferences in its favor. Cashion, 720 F.3d at 173.

To the extent Hebei Prince challenges not just the grant of summary judgment, but the district court's jurisdiction, we review legal conclusions regarding jurisdiction de novo and

factual findings for clear error.  Flame S.A. v. Freight Bulk

Pte. Ltd., 762 F.3d 352, 356 (4th Cir. 2014).


A.

Throughout its brief, Hebei Prince argues that the district

court lacked admiralty jurisdiction and therefore the case

should be dismissed.  DMCC responds that Hebei Prince confuses

the district court's admiralty jurisdiction with the merits of

DMCC's claim of a maritime lien arising under the FMLA.  We

agree with DMCC.

The Supreme Court noted the distinction, specifically in

the admiralty context, between establishing a court's

jurisdiction and the determination of the merits of a cause of

action over a century ago in The Resolute, 168 U.S. 437 (1897):

> Jurisdiction is the power to adjudicate a case
> upon the merits, and dispose of it as justice may
> require.  As applied to a suit in rem for the breach of
> a maritime contract, it presupposes-First that the
> contract sued upon is a maritime contract; and second,
> that the property proceeded against is within the
> lawful custody of the court.  These are the only
> requirements necessary to give jurisdiction.  Proper
> cognizance of the parties and subject-matter being
> conceded, all other matters belong to the merits.
>
> . . . [T]he question of lien or no lien is not one
> of jurisdiction, but of merits.
>
> It is true that there can be no decree in rem
> against the vessel except for the enforcement of a lien
> given by the maritime law . . .; but, if the existence
> of such a lien were a question of jurisdiction, then

10

> nearly every question arising upon the merits could be made one of jurisdiction.

Id. at 439-40 (emphasis added). This admiralty-specific language is consistent with the Supreme Court's general statements in the non-admiralty context separating jurisdictional questions from those concerning the merits of an action. E.g., Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1387 n.4 (2014) ("'[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case.'" (quoting Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 642-43 (2002)).

Here, Hebei Prince acknowledges that the Bunker Confirmation was a maritime contract. See Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 24 (2004) (stating that whether a contract is a "maritime contract," "depends upon the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions" (internal quotation marks and alteration omitted)). Similarly, Hebei Prince does not contest that the Vessel was physically within the "lawful custody of the court" at the time of its arrest. See In re Millennium Seacarriers, Inc., 419 F.3d 83, 94 (2d Cir. 2005) ("[S]ubject matter jurisdiction lies in the

11

district court where the vessel or other <u>res</u> is located, but that jurisdiction does not attach until the vessel is arrested within the jurisdiction."). Thus, under the standard articulated in <u>The Resolute</u>, it is clear that the district court possessed admiralty jurisdiction.[2] See <u>Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena</u>, 86 F.3d 908, 912-13 (9th Cir. 1996) (conducting this inquiry); <u>see also</u> <u>Wilkins v. Commercial Inv. Trust Corp.</u>, 153 F.3d 1273, 1276 (11th Cir. 1998) (same).

As a result, Hebei Prince's arguments that DMCC does not have an enforceable maritime lien under the FMLA do not implicate admiralty jurisdiction, but rather go to the merits of DMCC's action. The district court had admiralty jurisdiction to consider DMCC's claim, and we have jurisdiction over this appeal under 28 U.S.C. § 1291.

---

[2] The Ninth Circuit has held that admiralty jurisdiction can arise under the FMLA even where it would not also arise under common law admiralty jurisdiction. <u>See</u> <u>Ventura Packers, Inc. v. F/V JEANINE KATHLEEN</u>, 305 F.3d 913, 919 (9th Cir. 2002) ("Although a maritime contract may support admiralty jurisdiction, it is not an essential prerequisite to a civil action in admiralty to enforce a statutory necessaries lien."). <u>But see</u> <u>E.S. Binnings, Inc. v. M/V SAUDI RIYADH</u>, 815 F.2d 660 (8th Cir. 1987) (concluding plaintiff could not proceed on a claim seeking enforcement of an FMLA maritime lien because the underlying contract was not a maritime contract and so the district court lacked admiralty jurisdiction), <u>overruled on other grounds by</u> <u>Exxon Corp. v. Cent. Gulf Lines, Inc.</u>, 500 U.S. 603, 612 (1991). We need not delve into that question here because jurisdiction exists in this case under traditional principles establishing admiralty jurisdiction.

B.

Before addressing Hebei Prince's substantive challenges to the district court's decision, we consider its threshhold arguments as to which country's law applies to the issues of contract formation.

In the district court, Hebei Prince argued that under Lauritzen v. Larsen, 345 U.S. 571 (1953), Greek law determined issues of contract between the parties, including whether DMCC was in privity of contract to the agreement and whether the Bunker Confirmation contained a binding choice-of-law provision. DMCC contended United States law applied, but that it made no real difference as the principles of contract law were the same under either country's law and would lead to the same result in its favor. After examining the terms of the Bunker Confirmation and the parties' arguments, the district court decided the most prudent course was to assume that Hebei Prince was correct and apply Greek law to any contract formation issues. As a corollary, the district court observed that it would reach the same conclusions on contract formation issues under United States law as it did applying Greek law.

On appeal, the parties do not make particularly robust arguments either as to the district court's choice of Greek law, its articulation of Greek contract law principles, or its conclusion that the same analysis would result under United

13

States law.  Hebei Prince instead maintains that the court erred in its application of Greek law to the factual record.  DMCC, in turn, maintains that while the district court should have applied United States law based strictly on the choice-of-law provision, it prevails under either country's law.

In Lauritzen, the Supreme Court set forth several factors for federal courts sitting in admiralty to consider in determining what country's law governs:  "(1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance of the injured party; (4) the allegiance of the defendant shipowner; (5) the place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum."  Trans-Tec Asia v. M/V HARMONY CONTAINER, 518 F.3d 1120, 1124 (9th Cir. 2008) (citing Lauritzen, 345 U.S. at 583-92).

In Triton Marine, however, we found it unnecessary to conduct a Lauritzen choice-of-law analysis because the contract at issue contained a choice-of-law clause.  See Triton Marine, 575 F.3d at 413; see also Lauritzen, 345 U.S. at 588-89 ("Except as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply.").  Relying on prior Supreme Court and Fourth Circuit case law, we concluded that "absent compelling reasons of public policy, a choice-of-law provision in a maritime contract should be enforced," and a Lauritzen choice-of-law analysis was

14

unnecessary.    Triton Marine, 575 F.3d at 415; see also

Bominflot, Inc., 465 F.3d at 148 (holding that the choice of law

question was "made easy" by the party's contractual provision

agreeing that English law would apply).[3]   Thus, for the reasons

set forth in Triton Marine and Bominflot, Inc., a Lauritzen

choice-of-law analysis is unnecessary in this case.

Moreover, we agree with the district court that the

applicable law on the issues of contract formation would be the

same whether Greek or United States law is applied.   As we

discuss in the context of the individual arguments below, Greek

contract law does not differ in any material respect from the

---

[3] The choice-of-law clause at issue in Triton Marine was located in the body of the contract.  575 F.3d at 413.   In Bominflot, we avoided the Lauritzen choice-of-law analysis based on a choice-of-law provision that was incorporated by reference. 465 F.3d at 148; see also Hawkespere Shipping Co., Ltd. v. Intamex, S.A., 330 F.3d 225, 233 (4th Cir. 2003) ("'Where the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice.'" (quoting Chan v. Soc'y Expeditions, Inc., 123 F.3d 1287, 1297 (9th Cir. 1997)).   These cases thus counsel that if we applied United States law to the question, we would enforce a contract's choice-of-law provision.   Applied here, so long as the General Terms were successfully incorporated to the Bunker Confirmation, see analysis infra II.D at 28 n.6, it would govern the dispute.
    Although Hebei Prince asserts various reasons why an otherwise incorporated choice-of-law provision should not be enforced against it, none demonstrates a compelling public policy.   For example, we have previously rejected arguments that enforcing such provisions adversely affects the interests of—and works a fundamental unfairness against—a vessel owner who was not party to the contract containing the choice-of-law provision. See Triton Marine, 575 F.3d at 413-16.

15

corresponding principles of United States law. For this reason, too, we need not resolve the choice-of-law question, as it makes no discernible difference to the relevant analysis in the case at bar. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 838 n.20 (1985) (Stevens, J., concurring in part and dissenting in part) ("If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." (quotation marks and citation omitted)); Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007) (stating that a conflict of law analysis is unnecessary if the laws of each jurisdiction are the same, or would lead to the same result, because there is no "conflict" in the law that needs to be resolved); Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d 154, 158 (1st Cir. 2005) ("[W]hen resolution of a choice-of-law determination would not alter the disposition of a legal question, a reviewing court need not decide which body of law controls."); Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005) ("[W]e [do] not have occasion to embark on a choice-of-law analysis in the absence of an actual conflict between the applicable rules of two relevant jurisdictions."); Cruz v. Am. Airlines, Inc., 356 F.3d 320, 331-32 (D.C. Cir. 2004) (same); Modern Equip. Co. v. Cont'l W. Ins. Co., 355 F.3d 1125, 1128 n.7 (8th Cir. 2004) (same); Schneider Nat'l Transp. v. Ford Motor

16

<u>Co.</u>, 280 F.3d 532, 536 (5th Cir. 2002) (same). We will therefore follow the district court's approach in using principles of Greek law pertaining to contract formation, but noting the parallel analysis under United States law.

## C.

Hebei Prince argues that the district court erred at the outset of the case as it contends that the record does not establish DMCC as a party in the underlying transaction and therefore without any right to bring the in rem action. Essentially, Hebei Prince contends DMCC was not in privity of contract with Tramp Maritime because it has not shown that it was an actual party to the Bunker Confirmation.[4] Consequently, Hebei Prince posits that DMCC cannot seek to enforce a maritime lien against the Vessel based on that agreement and that this problem requires dismissal of the suit or, at the very least, remand to resolve a genuine issue of material fact as to DMCC's

---

[4] Hebei Prince acknowledges that the Bunker Confirmation formed a contract between Tramp Maritime and another entity, but it disputes that DMCC is that other entity. In other words, Hebei Prince asserts that Tramp Maritime entered into an agreement with Bunkerfuels Hellas or even the entity identified on the Bunker Confirmation as "BUNKERFUELS A DBA/DIVISION OF WFS TRADING DMCC," but that no evidence in the record demonstrated that DMCC is either related by law to Bunkerfuels Hellas or is "BUNKERFUELS A DBA/DIVISION OR WFS TRADING DMCC." (<u>Cf.</u> J.A. 21.)

standing to bring an action based on the Bunker Confirmation. We disagree.

Applying principles of Greek agency law, the district court concluded that Vogas had entered into the agreement with Tramp Maritime on behalf of his principal, DMCC. See World Fuel Servs. Trading, 12 F. Supp. 3d at 802 ("The Greek doctrine of 'ostensible authority' is much like the agency law recognized in the United States, where '[t]he essential underlying principle in the agency relationship is the power of an agent to commit his principal to business relations with third parties.'" (citation omitted)). The district court emphasized that in contrast to the record DMCC pointed to as evidence that it was the seller of bunkers to Tramp Maritime, Hebei Prince presented no "specific facts" supported in the record that created a "'genuine issue for trial,' as to whether [DMCC] was a party to the contract." See id. at 804 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

We agree with the district court that the record permits no conclusion but that DMCC sold Tramp Maritime the bunkers specified in the Bunker Confirmation through its agent, Vogas. Because DMCC filed a verified complaint, it contains a sworn statement indicating that its contents are "true and correct based upon [the] personal knowledge and documents available to" DMCC, and we can treat those components of it as "the equivalent

18

of an opposing affidavit for summary judgment purposes." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); see also Supp. Rules for Admiralty or Maritime Claims R. C(2) (requiring that the complaint in an in rem action be verified). (See J.A. 18, containing the verification of Richard D. McMichael, a "Director of WORLD FUEL SERVICES TRADING, DMCC.) The verified complaint states that "World Fuel Services Trading, DMCC, d/b/a Bunkerfuels" entered into the agreement memorialized in the Bunker Confirmation for its subcontractor APSCO to deliver bunkers to the Vessel. (J.A. 14.) Consistent with this assertion, the Bunker Confirmation identifies the seller of the bunkers as "BUNKERFUELS A DBA/DIVISION OF WFS Trading DMCC." (J.A. 21.) Even more clearly, the invoice Tramp Maritime received after the bunkers had been delivered refers to "BUNKERFUELS A Division of World Fuel Services Trading, DMCC." (J.A. 22.)

While DMCC's name as specified in the verified complaint is "World Fuel Services Trading, DMCC," nothing in the record suggests that the "WFS Trading DMCC" identified on the Bunker Confirmation refers to an entity other than DMCC. All the record evidence points to the same conclusion: "WFS Trading DMCC" is "World Fuel Services Trading, DMCC," and "WFS" is simply an acronym for "World Fuel Services" rather than a formal designation of a separate entity. Examples of this practice

19

exist throughout this case: the website listed in the Bunker Confirmation (www.wfscorp.com) uses the elongated "World Fuel Services" throughout the website, the bunker invoice refers to both "World Fuel Services" and "WFS," as do other items in the record. (J.A. 21, 22.) Indeed, in other contexts, even Hebei Prince's filings use "WFS" and "World Fuel Services" interchangeably.

Furthermore, in his sworn declaration and deposition testimony, Jos Heijmen, the Senior Vice President of Credit & Risk Management of World Fuel Services Corporation, explained the relationship between the various entities. He stated that World Fuel Services Corporation is the parent corporation of "the World Fuel Services Group of Companies," which includes DMCC. (J.A. 252.) He observed that DMCC "is part of a network of affiliated and related companies that provide fuel to ocean-going vessels throughout the world, doing business under the trade name 'Bunkerfuels.'" (J.A. 252.) He noted that Bunkerfuels Hellas is the Athens, Greece branch of a World Fuel Services subsidiary, and that it "provide[s] marketing and promotion services to Greek ship operators/owners and local suppliers." (J.A. 252.) He stated that when a Bunkerfuels Hellas employee receives a bunker inquiry, the transaction is automatically routed through "the World Fuel's affiliated company located in the geographic region of the world where the

bunkers will be delivered to the vessel." (J.A. 252.) And he identified DMCC as World Fuel Service's "provider of bunker fuel for ocean-going vessels in the [United Arab Emirates] and the Middle East," and that DMCC is organized under the laws of the United Arab Emirates with its principal place of business in Dubai. (J.A. 251.)

Heijmen also explained that Vogas is an employee of Bunkerfuels Hellas, and is authorized "to enter into contracts with [Greek vessel operators/owners like Tramp Maritime] on behalf of and for the World Fuel Services affiliate located where the ship required and was supplied bunkers," including transactions on behalf of DMCC. (J.A. 252-53.) He specifically stated that Vogas was authorized "by World Fuel Services Trading, DMCC, in October 2012 to act and enter on behalf of World Fuel Services Trading, DMCC into the contract with Tramp Maritime Enterprises, Ltd. that is at issue in this case." (J.A. 253.)

Hebei Prince's attempts to ignore or explain away this testimony amounts to no more than conjecture. Without record evidence to support its assertions, Hebei Prince speculates that DMCC may not be the entity it purports to be, that documents cannot mean what they say on their face, and that entities are not related in the only way they are described above. Hebei Prince's parsing of Heijmen's declaration and deposition

21

testimony goes beyond any common-sense reading of those documents. In sum, it attempts to manufacture doubt where none exists to obscure the relationship between DMCC and the transaction at issue. Based on the record in this case, the district court did not err in concluding that Hebei Prince failed to show a genuine issue of material fact as to whether Vogas entered into the Bunker Confirmation as the agent of the seller, DMCC.

Lastly, Hebei Prince asserts that even if Vogas was DMCC's agent, that fact "was not accurately disclosed and was misleading." (Opening Br. 19.) We readily reject that notion. The Bunker Confirmation hardly disguises the identity of the seller, "BUNKERFUELS A DBA/DIVISION OF WFS Trading DMCC." (J.A. 21.) Regardless of the effectiveness of the incorporation by reference, the Bunker Confirmation also refers to and directs readers to the "<u>SELLER'S</u> GENERAL TERMS AND CONDITIONS . . . FOUND AT WWW.<u>WFSCORP</u>.COM." (J.A. 21 (emphasis added).) In addition, the email addresses provided for both Vogas and Bunkerfuels Hellas contain the domain "<u>wfscorp</u>.com." (J.A. 21 (emphasis added).) The Bunker Confirmation plainly provides notice of Vogas' association with WFS subsidiary DMCC.

For these reasons, we conclude the district court did not err in concluding that DMCC was in privity of contract with Tramp Maritime. It follows that regardless of its eventual

22

success on the claim, DMCC could assert a cause of action based on an alleged breach of the Bunker Confirmation, including a claim that it had an enforceable maritime lien under the FMLA.

D.

Next, we address whether the district court erred in concluding Greek law would recognize the language contained in the Bunker Confirmation to validly incorporate World Fuel Service's General Terms & Conditions ("General Terms"). As noted, the Bunker Confirmation states it is

> GOVERNED BY AND INCORPORATES BY REFERENCE SELLER'S GENERAL TERMS AND CONDITIONS IN EFFECT AS OF THE DATE THAT THIS CONFIRMATION IS ISSUED. THESE INCORPORATED AND REFERENCED TERMS CAN BE FOUND AT WWW.WFSCORP.COM. ALTERNATIVELY, YOU MAY INFORM US IF YOU REQUIRE A COPY AND SAME WILL BE PROVIDED TO YOU.

(J.A. 21.)

The undisputed evidence in the record reflects that to reach the text of the General Terms on wfscorp.com, a user must click on two more links: either by clicking on a link labeled "Marine" and then on a second link labeled "Marine Terms and Conditions," which contains a .pdf version of the General Terms, or by hovering over a "By Sea" graphic, clicking on the link "learn more," and then clicking on a link labeled "Marine Terms and Conditions." (J.A. 316, 321-28.)

23

The parties submitted declarations from Greek attorneys stating their respective opinions on whether and when terms are incorporated by reference, and whether and when a choice of law provision is enforceable under Greek law. Unsurprisingly, although the attorneys agreed about these broader points of Greek law, they disagreed about whether the Bunker Confirmation satisfied them.

The district court ruled that no genuine issue of material fact existed as to whether the Bunker Confirmation validly incorporated the General Terms. Based on the information provided by both parties, the district court noted that Greek law respected choice of law provisions, and also authorized contracts to incorporate other documents by reference. See Fed. R. Civ. P. 44.1 (stating, in relevant part, that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence"). The district court observed that Hebei Prince's Greek attorney witness stated that such provisions must be drafted in "a clear, plain and explicit way" to be valid. World Fuel Servs. Trading, 12 F. Supp. 3d at 804. And it also observed that DMCC's Greek attorney witness stated that Greek law recognized that terms can be incorporated by reference so long as the contracting parties obtain knowledge of their

24

contents <u>or</u> be given the opportunity to obtain such knowledge. The court then held that the Bunker Confirmation's language satisfied both of these standards. That is, it was "sufficiently clear and explicit to direct Tramp [Maritime] – as well as anyone else who received the bunker confirmation – to the General Terms." <u>Id.</u>

The district court also rejected Hebei Prince's argument that the General Terms lacked the requisite clarity because the preamble did not identify DMCC by name. The court first observed that the preamble to the General Terms provided a non-exclusive list of corporations to which it applied, so DMCC's absence had no significance. Then, the court noted that the preamble stated that the General Terms applied to "'all subsidiaries of [WFS],'" and that the record evidence showed DMCC was a subsidiary of WFS. <u>Id.</u> at 796. Lastly, the court stated that since the Bunker Confirmation incorporated the General Terms, DMCC had adopted the document regardless of what the General Terms preamble purported its applicability to be.

Hebei Prince's arguments on appeal echo those it made to the district court, that the Bunker Confirmation did not validly incorporate the General Terms because it does not identify the specific internet site where those provisions could be located. In addition, it asserts that because the preamble to the General

Terms does not specifically refer to DMCC or Bunkerfuels, the document does not clearly apply to the transaction at issue.

The district court did not err in concluding that the Bunker Confirmation validly incorporated the General Terms into the agreement. The Bunker Confirmation plainly expresses that it incorporates the terms of another specific document, the General Terms. Consequently, Tramp Maritime, along with any other reader of the Bunker Confirmation, was immediately put on notice of the existence of a specific additional document that contained provisions that were also part of the Bunker Confirmation. In addition, the Bunker Confirmation provides two means of obtaining a copy of the General Terms: visiting the wfscorp.com website or asking for a copy. Although individuals in search of the General Terms need to click on two internal links to reach the text, the terms are readily found through wfscorp.com links identified by such relevant language as "By Sea," "Marine," and "Marine Terms and Conditions." See One Beacon Ins. Co. v. Crowley Marine Servs., Inc., 648 F.3d 258, 266-70 (5th Cir. 2011) (using a similar standard (unambigious, clear, specific, conspicuous, and explicit) for valid incorporation by reference to conclude that terms and conditions available four clicks into the website contained in the contract were validly incorporated). Moreover, had any reader asked for a copy of the referenced document, the text would have been

readily reviewable in that form as well.[5] On its face, then, the Bunker Confirmation effectively incorporated the General Terms. As the district court concluded, the incorporation was "sufficiently clear and explicit to direct" readers to the General Terms and it "explicitly offered Tramp [Maritime] 'the opportunity to obtain knowledge' of the General Terms." World Fuel Servs. Trading, 12 F. Supp. 3d at 804.

The language in the preamble to the General Terms does not alter this conclusion. The preamble does not purport to identify an exhaustive list of entities to which it applies. Instead, it states that the group of companies to which it applies "includes, but is not limited to" certain delineated companies. (J.A. 23.) The preamble also states that it applies to "the World Fuel Services corporation Marine Group of companies . . . and their respective trade names, subsidiaries, affiliates and branch offices. This list includes all subsidiaries of [WFS] who have sold, are selling or will sell marine petroleum products and services, whether or not in existence on the effective date." (J.A. 23.) For the reasons already identified in part II.C, supra, DMCC and Bunkerfuels fall within the network of WFS marine companies. Accordingly,

---

[5] Hebei Prince does not contend that it or Tramp Maritime ever requested a written copy of the General Terms. Nor does it contend that the website access procedure described above is inaccurate.

27

the General Terms do not create doubt as to their applicability to DMCC or otherwise undermine the Bunker Confirmation's incorporation of the General Terms by reference.[6]

E.

Having concluded that the Bunker Confirmation validly incorporated the General Terms as part of the formation of the governing contract between the parties, we turn to Hebei Prince's contention that the General Terms' choice-of-law provision does not encompass the FMLA. In that regard, the General Terms provide, in pertinent part:

> The General Terms and each Transaction shall be governed by the General Maritime Law of the United States and, in the event that the General Maritime Law of the United States is silent on the disputed issue, the law of the State of Florida, without reference to any conflict of laws rules which may result in the application of the laws of another jurisdiction. The General Maritime Law of the United States shall apply with respect to the existence of a maritime lien,

---

[6] Even if we had bypassed Greek law and instead applied United States law, we would reach the same result and conclude that the choice-of-law clause was successfully incorporated. "Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together." One Beacon Ins. Co., 648 F.3d at 267 (citing 11 Williston on Contracts § 30:25 (4th ed. 1999)). For the reasons articulated above, the parties' intent here is clearly expressed by the provisions in the Bunker Confirmation stating that it would be governed by the General Terms, as well as the language informing Tramp Maritime (or any reader) of two means of acquiring the text of the General Terms.

28

regardless of the country in which Seller takes legal
action.

(J.A. 34.)

The district court rejected Hebei Prince's argument that
the phrase "General Maritime Law of the United States" did not
include the FMLA. Observing that United States maritime law has
developed through both case law and statutes, the district court
noted that "'when a statute resolves a particular issue, . . .
the general maritime law must comply with that resolution.'"
World Fuel Servs., 12 F. Supp. 3d at 806 (quoting Norfolk
Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 817
(2001)). The court then traced the evolution of the FMLA from
its original enactment in 1910 through its various amendments,
which slowly altered principles previously established in the
"general maritime law" concerning maritime liens under United
States law. It concluded that since "general maritime"
principles "must" give way to conflicting statutes where
Congress has spoken on a particular issue, "the General Maritime
Law of the United States" essentially changes to be consistent
with the statutory principles. Accordingly, the district court
ruled that the General Terms' choice of "General Maritime Law of
the United States" included the FMLA. Id. at 807-08.

Citing to various cases and the legislative history of the
FMLA, Hebei Prince contends this was error because the phrase

29

"General Maritime Law of the United States" is generally
construed as a term of art to only encompass maritime case law
rather than maritime statutory law.[7]  Hebei Prince argues that
under this construction of the term, DMCC faces a Catch-22
conundrum.  On the one hand, the General Terms would not allow
DMCC to rely on a maritime lien arising under the FMLA because
"General Maritime Law of the United States" excludes statutory
law.  On the other hand, DMCC could not obtain a maritime lien
under case law because the FMLA is now the sole means of
obtaining a maritime lien for the provision of necessaries under

---

[7] For example, Hebei Prince observes that the Supreme Court
has frequently distinguished between statutory and general
maritime law.  See E. River S.S. Corp. v. Transamerica Delaval,
Inc., 476 U.S. 858, 864 (1986) ("Absent a relevant statute, the
general maritime law, as developed by the judiciary, applies.").
In addition, it relies on the Fifth Circuit's discussion in
McBride v. Estis Well Serv., L.L.C., 731 F.3d 505 (5th Cir.
2013), in which the court stated:

> There are two primary sources of federal maritime law:
> common law developed by federal courts exercising the
> maritime authority conferred on them by the Admiralty
> Clause of the Constitution ("general maritime law"),
> and statutory law enacted by Congress exercising its
> authority under the Admiralty Clause and the Commerce
> Clause ("statutory maritime law").

Id. at 507-08.  Although it is unrelated to Hebei Prince's
argument, we note that the panel decision in McBride has
subsequently been vacated in light of the grant of
rehearing en banc, 743 F.3d 458 (5th Cir. 2014), and en
banc decision, 768 F.3d 382 (5th Cir. 2014).  The en banc
dissent still reiterates this same general principle.  768
F.3d at 405 (Higginson, J., dissenting).

United States law.  Consequently, Hebei Prince argues that the General Terms do not entitle DMCC to a maritime lien.

To be sure, the General Terms' choice-of-law provision could have been written in a way that would avoid this question entirely.  In Triton Marine, for example, the relevant clause stated that the "agreement shall be governed by and construed in all particulars by the laws of the United States of America[.]" 575 F.3d at 412.  So, too, the Ninth Circuit has reviewed a choice-of-law provision that selected "the general maritime laws of the United States and applicable United States Statutes." Flores v. Am. Seafoods Co., 335 F.3d 904, 918 n.8 (9th Cir. 2013).  Either of these constructions clearly incorporates federal statutory maritime laws such as the FMLA.

But even assuming, without deciding, that Hebei Prince's reading of the term "General Maritime Law of the United States" is correct and the FMLA is not part of the "General Maritime Law of the United States," Hebei Prince still cannot prevail.  This is so because the General Terms alternatively provides if the "General Maritime Law of the United States is silent on the disputed issue, the law of the State of Florida [governs.]" (J.A. 34.)

Florida law resolves the issue in favor of DMCC because Florida law must be deemed to include United States law—by case law or by statute.  The Supreme Court has long stated that "'a

31

fundamental principle in our system of complex national polity' mandates that 'the Constitution, laws, and treaties of the United States are as much a part of the law of every state as its own local laws and Constitution.'" Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 157 (1982) (quoting Hauenstein v. Lynham, 100 U.S. 483, 490 (1879)). A choice-of-law provision directing us to the laws of Florida thus encompasses federal statutory law, including the FMLA. See Atkinson v. General Elec. Credit Corp., 866 F.2d 396, 398-99 (11th Cir. 1989) (concluding, based in part on Fidelity Fed. Sav. & Loan Ass'n, that "Georgia law includes federal law" where a choice-of-law provision selected "the laws of the State of Georgia" but was silent as to federal statutory law's applicability). Accordingly, the General Terms' choice-of-law provision authorizes DMCC to pursue a maritime lien under the FMLA.

F.

Hebei Prince alternatively argues that even if the FMLA applies to the transaction, DMCC is still not entitled to a maritime lien because it has not satisfied all of the requirements under the FMLA. Once again, we disagree.

In relevant part, the FMLA provides that "a person providing necessaries to a vessel on the order of . . . a person

32

authorized by the owner" "has a maritime lien on the vessel" and "may bring a civil action in rem to enforce the lien." 46 U.S.C. § 31342(a). The FMLA creates a presumption that charterers (e.g., Tramp Maritime) have such "authority to procure necessaries for" the Vessel. See § 31341(a)(4)(B).

Hebei Prince contends that it produced proof rebutting this statutory presumption that Tramp Maritime had such authorization here. Alternatively, Hebei Prince maintains that the record demonstrates a genuine issue of material fact as to whether the presumption applies. It asserts DMCC had actual knowledge that Tramp Maritime was not authorized to enter into agreements that would give rise to a maritime lien against the Vessel and points to two prior contracts between Bunkerfuels Hellas and Tramp Maritime, where Tramp Maritime had placed no-lien stamps on the delivery receipts. Hebei Prince contends these prior acts provided DMCC cognizable notice that Tramp Maritime could not procure necessaries in an agreement that would bind the Vessel. In addition, Hebei Prince maintains that upon seeing the no-lien stamp affixed to the delivery receipt for the bunkers at issue here, DMCC's sub-contractor APSCO could—and should—have engaged in self-help to immediately reclaim the bunkers. Hebei Prince asserts DMCC's failure to take such prompt action following actual notice of the no-lien provision caused it to waive the right to a maritime lien.

33

We agree with the district court that no triable issue of fact exists on this issue. The statutory presumption discussed above can be rebutted only by proof that the seller had actual knowledge that the charterer lacked the ability to bind the vessel as part of the contract for necessaries. See Triton Marine, 575 F.3d at 418 n.5 (observing that in 1971 Congress recodified the FMLA "essentially to void 'no lien' clauses in charters, as long as the supplier did not have actual knowledge of such clause"); Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV, 199 F.3d 220, 224-25 (5th Cir. 1999) (discussing cases in the Fifth and Eleventh Circuits holding the same, as well as recounting the changes in the statute leading to this conclusion). Put another way, "a supplier of necessaries ordered by a § 31341(a) entity subject to a no-lien clause not made known to the supplier has a maritime lien." Lake Charles Stevedores, 199 F.3d at 225.

None of the evidence Hebei Prince relies on demonstrates that DMCC had actual knowledge of the no-lien provision in Tramp Maritime's charter party. Hebei Prince does not contend that it or Tramp Maritime ever notified DMCC or Bunkerfuels Hellas of the terms of their charter party. This is so despite the Bunker Confirmation clearly stating that Tramp Maritime "is presumed to have authority to bind the [Vessel] with a maritime lien." (J.A. 21.) The Bunker Confirmation thus plainly contemplated

34

that a presumption of authority to obligate the Vessel existed, and there is no evidence that anyone attempted to notify DMCC to the contrary at any point between Tramp Maritime receiving the Bunker Confirmation and accepting delivery of the bunkers.

The no-lien stamps affixed to prior delivery notices when Tramp Maritime was operating under prior charter parties is insufficient to provide actual knowledge of the current charter party. Those prior stamps say nothing about the terms of Tramp Maritime's charter to operate the Vessel at the time it entered into the agreement set forth in the Bunker Confirmation.

The primary case Hebei Prince relies upon to satisfy its burden, Belcher Oil Co. v. M/V GARDENIA, 766 F.2d 1508 (11th Cir. 1985), materially differs from the facts here. In Belcher Oil, the supplier was notified prior to delivery of the bunkers that the charter party contained a no-lien clause prohibiting the charterer from obligating the vessel. Id. at 1510. Only as "corroborat[ion]" of this finding of actual knowledge did the Eleventh Circuit also note that the charterer had put disclaimer stamps on the bunkering certificates for prior deliveries from the same seller. However, the presumption against lien authority was only rebutted because the evidence showed the supplier actually knew the charterer was bound by a no-lien clause before delivery of the fuel. By contrast, there is no proof in this case that DMCC actually knew that the operative

35

charter party contained a no-lien clause. Accordingly, Hebei Prince cannot rebut the presumption based on prior contracts between Tramp Maritime and Bunkerfuels.

Hebei Prince's second argument fares no better, as the no-lien stamps affixed to the delivery notices did not provide timely actual notice of any no-lien clause in the charter party. This is so for at least two reasons. First, the Bunker Confirmation states that "[d]isclaimer stamps placed by [anyone] on the bunker receipt will have no effect and do not waive the seller's lien." (J.A. 21.) Despite this language, Tramp Maritime never contacted DMCC to convey the terms of the charter party or that it viewed the no-lien stamps as effective. Moreover, anyone reading the terms of the Bunker Confirmation would have reason to believe that even if a no-lien stamp was placed on the delivery receipt, it would be of no effect. Given the terms of the Bunker Confirmation, DMCC and its subcontractor APSCO both had reason to believe that any no-lien stamps were ineffective.

Second, delivery of the bunkers fulfilled DMCC's obligation under the Bunker Confirmation, and notice at that point of the no-lien provision would be too late to alter the terms of the existing agreement. Contrary to Hebei Prince's assertion, DMCC was not required to engage in self-help and demand immediate return of the bunkers upon learning that a no-lien stamp had

36

been affixed to the delivery notice. The out-of-circuit case it relies on for this assertion is not binding on us. See Ferromet Res. v. Chemoil Corp., 5 F.3d 902, 903 (5th Cir. 1993). More importantly, the FMLA's provisions were not at issue before that court, and it did not discuss the presumption that arises under § 31341(a) or what evidence is sufficient to rebut it. Id.

Ferromet Resources involved a tort claim brought by the charterer against a supplier after the supplier of bunkers refused to unmoor from alongside the vessel until the delivery notice was signed without a no-lien stamp. The Eleventh Circuit held that a genuine issue of material fact existed as to when the supplier was notified that the charterer lacked authority to incur liens. If it was before delivery, then the charterer could likely recover damages incurred as a result of the delay caused by the supplier's refusal to unmoor. Id. at 905. If the supplier was not notified of the no-lien clause until delivery, then the supplier may have been entitled to engage in self-help. Id. Nothing in Ferromet Resources suggests that a supplier must engage in self-help or attempt to retrieve delivered bunkers simply because a no-lien stamp has been placed on the delivery receipt.

Accordingly, we conclude that § 31341(a)'s presumption of authority to procure necessaries applies to the Bunker Confirmation transaction. Hebei Prince failed to demonstrate or

37

even proffer evidence creating a genuine issue of material fact as to whether DMCC had actual knowledge of Tramp Maritime's lack of authority to bind the Vessel.

Given that the remaining § 31342(a) requirements are either uncontested or have already been resolved in DMCC's favor, we also conclude that DMCC was entitled to bring this action to enforce a maritime lien against the Vessel.

### G.

Hebei Prince's final, comity-themed argument echoes throughout its brief. It contends that United States law with respect to maritime liens is so "out of step with existing international conventions and the law of other major maritime nations" that the Court should find a way to conclude no lien arose under the facts of this case. (Opening Br. 51.) As Hebei Prince acknowledges, its arguments align with those previously rejected in other cases, most directly Triton Marine. "'[A] panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting en banc can do that.'" Scotts Co. v. United Indus. Corp., 315 F.3d 264, 271 n.2 (4th Cir. 2002) (quoting Mentavlos v. Anderson, 249 F.3d 301, 312 n.4 (4th Cir. 2001)). Accordingly, we need not engage this argument further.

38

III.

For the reasons explained above, we affirm the judgment of the district court granting summary judgment to DMCC.

AFFIRMED